Filed 12/3/21  P. v. McClanahan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088638 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE012988) |
| v. | |
| JUSTIN CARL MCCLANAHAN, | |
| Defendant and Appellant. | |

A jury found defendant Justin Carl McClanahan guilty of five counts of lewd and lascivious acts on a child.  The victims were his two younger sisters.  He was sentenced to an aggregate 30-year term.

On appeal, defendant contends the trial court abused its discretion in (1) admitting certain hearsay statements made by the victims and their grandfather; (2) excluding evidence of a victim's false allegation unless the person accused testified as to the falsity of the allegation; and (3) admitting expert testimony regarding Child Sexual Abuse

1

Accommodation Syndrome.  He also contends (4) the errors are cumulatively prejudicial.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A jury found that between 2003 and 2005 defendant molested his sisters (the first and second victims) who were respectively 7 and 12 years his junior.  Defendant's parents, the two victims, a high school teacher, a high school counselor, the director of a boarding school, a deputy, and a detective testified.

### The Mother's Testimony

Defendant's mother testified that defendant, "a difficult teenager," would watch his siblings when she slept.

In the fall of 2011, the first victim told her parents that defendant had touched her inappropriately.  They didn't call the police but arranged therapy for the first victim.  The mother testified, "We wanted justice, but we didn't want to ruin [defendant's] life."  The parents wanted defendant to apologize and make amends — though at trial the mother conceded, "we made a wrong decision."

When defendant and his wife visited around thanksgiving, the parents spoke to him alone about their daughter's disclosure.  Defendant immediately said "Yeah, I did."  They said he needed to apologize and to make it right for the victim.  Defendant initially agreed.  But when he returned to Seattle, he called and said he couldn't remember the details of what he did, and he didn't want to apologize for something he couldn't exactly remember.  He asked for their patience while he saw a therapist.

The parents contacted defendant every two weeks, and defendant repeated that he was working on it and asked them to be patient.

Nine months later, after the first victim turned 18, defendant told the parents, "you know, now that [the first victim] is 18, you can't go to the police on her behalf anymore. I know she's not going to do it and there's nothing you can do."  The parents did not speak to defendant for a year.

2

In 2013, the second victim was having trouble at home. She wrote about suicide and cut and burned herself. She left her high school after being caught drinking, went to a charter school, and then in May 2015 was sent to an out-of-state boarding school after suicide implements were found in her bedroom.

When the parents went to visit in February 2016, the boarding school director told them there was something they needed to know. The second victim told them defendant had done the same thing to her that he did to the first victim.

The parents flew the second victim home and went to the Sheriff's department. The mother testified that they went to the police this time because "[w]e finally absorbed the fact that he's a predator."

The mother testified to receiving emails threating disinheritance from her parents if the girls continued with the investigation and testified. A letter from defendant said they wouldn't see their grandchildren because they wouldn't drop their attempt to get him to apologize and make things rights. A letter from her father (the grandfather) said what happened, happened, and cannot be changed; everyone should move on.

### The Father's Testimony

The father provided substantially similar testimony. Defendant was a difficult teenager — he would not want to do his schoolwork and was unkind to his younger siblings. When the parents were out, defendant was put in charge of the younger children. Defendant left for college in the fall of 2005 and got married three years later.

In 2011, the first victim disclosed the molestation to a teacher. She subsequently told her parents defendant had molested her.

They decided to handle it in the family and contacted a therapist. They also confronted defendant when he visited in November 2011. Defendant admitted the molestation, and they told him to make amends. They did not, however, call the police. But in December 2011, Child Protective Services (CPS) contacted the father, and he told them his daughter had disclosed being molested by her brother.

3

The parents continued to reach out to defendant, who "kind of stalled us." When the first victim turned 18, defendant said he no longer had to apologize. He subsequently made clear he did not want his parents to bring up the subject and threatened them with not seeing their grandchild.

The father also testified that the second victim had "significant problems" and left her high school after "things fell apart." They put her in a charter school and then boarding school after finding poison, nooses, and razor blades in her room.

When they visited her nine months later, they met with her and the boarding school director. The second victim said defendant had molested her. The father testified, "then a lot of things made sense." They flew home and went to the sheriff's office the next day. On the way home, the second victim was happy to see her parents and happy to be coming home.

At the sheriff's department, the parents gave a statement to a deputy and the second victim separately gave one. But the first victim was not interested in involving law enforcement.

The father testified the disclosures created fractures in the family: "I have no relationship with my parents, with my wife's father." In May 2016, they received a letter from the grandfather that said for the good of the family, the girls should refuse to testify. The grandfather also threatened to go to the newspaper and the father's work and smear the father's reputation.

The father also testified that the second victim, who was currently living with the parents, told them she was going to recant.

**The First Victim's Testimony**

The first victim was 24 at the time of trial. She testified that starting when she was "eight or so," defendant, who is seven years older, would take her upstairs to his room and tell her to undress. He would remove his shorts and touch her vagina with his hands and penis. This happened when their mother was sleeping, their father was at work, and

4

defendant was left in charge.

She couldn't remember how defendant got her to come to his bedroom the first time. But subsequent times, he would threaten to hit her or beat her up. He also threatened to hurt her or her dog if she said anything.

She testified the molestations were not "super frequent," but "frequent enough." Asked if it happened more than 10 times, she testified "I think so." The molestations ended sometime before defendant left for college.[1] She did not know her younger sister was also being molested.

The first victim described her family and home life as dysfunctional and chaotic. Her parents fought, and her mother and defendant argued and fought "a lot." The first victim was not close with defendant: "We had times that we could laugh or joke about something, but for the most part, he picked on me a lot." Defendant would hit her and his younger brother.

She wasn't close with her parents and did not feel she could go to them with problems. Her mother was "always angry about something." She felt afraid of her mother, who "would tell us how to behave and what would happen if we didn't." And when she told her father that defendant would hit us, "he didn't really do anything."

In high school, she was depressed and drank, cut her wrists, and took pills. Towards the end of her junior or beginning of her senior year, she told a bible class teacher what defendant did. The teacher said she needed to tell her parents. She initially resisted, but eventually did. Her mother said, "we don't want [defendant] to get in

---

[1] The first victim testified that she had told an officer that the molestations continued until defendant went to college, but her mother had told her to say that because the second victim had also said it. Also, the mother said, "you should put it in there because if it did happen after he is 18, he should be held accountable." Ultimately, the first victim testified that "I can't say for sure that it did happen until he went to college, and I can't for sure say it didn't happen until he went to college just because I never made a land marker of when it stopped. I just knew it had stopped."

trouble." The first victim testified that around that time, defendant had been threatening their mother with not seeing the grandkids, and "I think that was the big factor in not wanting to upset him."

She also told a school counselor defendant had touched her inappropriately for three months. Though she testified that she had minimized the time span "so it wouldn't blow up."

The counselor contacted CPS, and a social worker visited the school. The first victim told the social worker she didn't want to talk about it. Her mother had told her not to tell the whole truth to CPS.[2]

At some point, the parents confronted defendant. She later learned that they had planned to have defendant apologize. But defendant never "owned up to it" or apologized.

At another point, her mother told her the second victim had also been molested by defendant. The first victim spoke with law enforcement in 2016. She testified her mother coerced her into telling the police what happened: "She basically put a ton of pressure on me to go to the police with my sister and share what happened, implying things like that I would be cut off and . . . wouldn't have any support if I didn't."[3]

---

[2] The mother testified to no memory of telling the first victim to minimize what she said to CPS. But on cross, when asked, "So by telling [the first victim] that she could say whatever she wanted to say, didn't you know and wasn't that a signal to [the first victim] to say nothing?" She testified, "I can see how it would be viewed that way and that was wrong of me and [the father]."

[3] Also before trial, the first victim texted defendant's wife, stating: "I'm going to shut down every question at the trial and tell them point blank it was because of my mother's coercion," and, "I will help you sue her [the mother] when this is over." About the text, she testified: "I had just been kicked out of my parents' house, and I was upset at my mom for the hurtful things she said to me as she was kicking me out, and I basically was thinking I don't want [defendant] to go to jail. So I'm going to do everything I can to

6

She also testified that in early 2016, she had been asked by a cousin (who shortly thereafter passed away) to tell defendant "hello" and that he loves him. When she called defendant to pass along the message, defendant told her he was sorry for anything that he might have done to hurt her. She didn't ask for clarification.

Another time in 2016, the first victim spoke with defendant's wife over Skype and told her what defendant had done. Toward the end, defendant joined the conversation. In mid-2016, she received an email from defendant's wife, expressing her dismay about going to the police, saying if defendant went to prison, her son would grow up without a father.

Also in 2016, two grandparents and several aunts and uncles emailed and called, pressuring her to recant. A phone conversation she had with her grandfather is discussed in more detail, *post*.

### The High School Bible Class Teacher's Testimony

The high school bible class teacher testified that the first victim told him she had been sexually abused by defendant. She said it had gone on since she was eight until she was 12, and that was the reason for her depression and drinking.

The teacher called CPS, testifying, "I'm under legal obligation to do so, and so I had to have a conversation with my superintendent and administration . . . ." He also encouraged the first victim to talk with the school counselor. The first victim, however, said she didn't want to tell her parents. The teacher described the parents as "angry and abusive in that relationship."

The teacher also had defendant as a student in 2006. Once defendant came to him after class and asked about forgiveness, saying "you don't understand what I've done or how bad I am." The teacher testified, "I had no idea if it was referring to anything."

---

keep that from happening. But then after the anger passed, I kind of realized I still had a responsibility to what happened to me to speak the truth."

## The High School Counselor's Testimony

The counselor testified that the first victim was referred to her by the bible class teacher in late 2011. She understood that the first victim had disclosed being molested by her brother and that CPS had been contacted. Eventually, the first victim disclosed the molestation to her. She said she had been molested for three months during the summer, when she was eight and defendant was 18.

The first victim also said that her mother had told her to lie to CPS. The mother wanted to protect defendant's reputation and didn't want to be cut off from future grandkids.

The counselor had also counseled the second victim, who was cutting herself, suffering from an eating disorder, and posting provocative pictures online. At some point the second victim discovered what had happened to her sister, and the counselor made a note in early 2013 that she was "still processing what happened between [defendant] and [the first victim]." The counselor explained, "She wasn't really wanting to talk about it." When the counselor asked the second victim if anyone had touched her inappropriately, she said no and that she didn't want to talk about it.

## The Second Victim's Testimony

The second victim was 19 at the time of trial. She testified that nothing inappropriate happened between her and defendant, explaining that "my sister had already told my parents, and . . . I didn't want to talk about what was going on with myself and my own issues, so I piggybacked on her problem, and that was awful of me."

She testified that when the first victim was 17, the first victim told her and their parents that defendant had molested her. The second victim did not disclose also being molested because, as she testified, nothing had happened to her.

She also testified that during high school she suffered from depression, had an eating disorder, and was cutting herself. She was expelled in her sophomore year for drinking. She began an independent study program and then went to an out-of-state

8

boarding school in May 2015. Her parents took her to boarding school under the guise of visiting a sibling but ended up dropping her off. She testified that "hurt a lot." She was there for nine months and had nightmares, anxiety attacks, and long crying spells, though "more towards the beginning."

Around October 2015, she said to the director of the boarding school, "why me," and "I can't live like this." She also said defendant had hurt her and that she couldn't stop reliving her brother's room and all he did to her there. She testified, however, "that wasn't true what I told her." She explained, "I was going through a lot of stuff, and I didn't want to tell her what I was going though, and so I — I am very sorry for this now, but I pinned it on something that was already going on with my sister, and I regret that."

The director told her she had to tell her parents and she did not want to because, as she testified, "It wasn't true." But when her parents came and she met with them in front of the director, she told them defendant had molested her. The parents pulled her out of boarding school and brought her home.

They went to the sheriff's office the next day and spoke to a deputy. She testified, "I told the deputy what I had said happened, but it did not happen." She also testified that she thought up, on the spot, the details of the molestations and defendant's threats to kill her cat.

She later met with a detective. The detective read her the statement she gave to the deputy, and she confirmed everything was true except for her birth date. She testified, however, that she was lying.

Sometime before talking to the detective, she Skyped with the first victim and told her about what had happened to her. Her sister was upset and crying, and said, "I'm so sorry, I'm so sorry." The first victim flew home to see her.

The second victim also testified she could not remember if defendant had babysat her and her siblings when her parents were out, and she denied that defendant had picked on her. She denied her homelife was chaotic or dysfunctional, and testified she got along

9

with her parents and could talk to them. She denied her depression had to do with her homelife, or with defendant: "I had been picked on at school, but nothing other than that."

She testified that she did not tell anyone she had falsely accused defendant, until a few weeks before trial when she contacted the prosecutor's office and told her parents she had lied.

## The Boarding School Director's Testimony

The director of the boarding school testified that when the second victim came to the school, the director had been told her sister had disclosed being molested and was suicidal, and they thought that perhaps the same thing had happened to the second victim.

At the boarding school, the second victim started having nightmares, and would say, "I keep reliving it," but would not explain. She also had panic attacks and would start crying and shaking suddenly.

Right before her parents were scheduled to visit, the second victim told the director that she kept reliving what happened in her brother's bedroom and said he had not only molested her sister, but her as well. The director told her she needed to tell her parents. The second victim said she didn't want to be treated differently; she didn't want to be treated like her sister.

When the parents arrived, the director told them the second victim had something to say. The second victim then disclosed defendant had molested her.

## The Deputy's Testimony

The deputy testified that she took a statement from the second victim, who reported defendant had molested her since she was three years old. The second victim couldn't recall the details of the first incident but recalled her father was working, her mother was napping, and defendant was watching her and her siblings in the early afternoon. Defendant was then a teenager and a lot bigger than her. Defendant grabbed her arm and took her upstairs to his bedroom. She didn't know why he seemed angry.

10

Upstairs, he closed the door and "threw her on his bed." He got on top of her and said, "if you fight, it will make it worse." He held her arms above her head, then opened her knees with his. He then pulled down his pants and put his penis inside her.

When she tried to scream, he put his forearm over her mouth and nose, pushing down hard. Defendant threatened to kill her cat if she said anything or didn't do everything he said. He then put his fingers in her vagina.

He tried to kiss her but stopped when she tried to bite him. He told her he would kill her if she didn't stop fighting.

She said the abuse went on for the next three years, occurring approximately two to three times a week. She also said defendant would frequently babysit her and her siblings. She did not know that defendant was also abusing her sister. But she said at times defendant would take her older sister to a different room.

### The Detective's Testimony

The detective testified that she interviewed both victims. The detective's February 2016 recorded interview with the second victim was played for the jury. In the interview, the detective asked the second victim's age and she responded that she was turning 17 soon, adding, "so that's kinda like the reason — because . . . when it happened to my sister and my parents found out when she was 17… [¶] [defendant] . . . was like, 'Oh just, um, I'll make it right somehow' until she turned 18 and then he was like, 'Well, joke's on you.' " She also said the first victim was "scared of him so she doesn't want to [press charges], adding Like she wants to. I know because I feel the same way."

In the interview, the detective read the deputy's report to the second victim. The victim confirmed her statements to the deputy were correct.

The victim also described the last time defendant molested her, she was playing outside, and defendant came out and asked her to help him pack. She protested that he wasn't leaving for a month, but he said, "Just come help me anyway." "I had to go because of his voice," she explained, "I knew if I went what would happen and I knew

11

what would happen if I didn't go . . . ."

He locked the door to the house. In his bedroom, he took off her shorts and underwear and put his fingers in her vagina. He put his mouth on her vagina, but she kicked him. He also put his penis in her vagina. At the end he said, " 'Remember if anyone ever finds out what's gonna happen to you and what's gonna happen to me.' " He then pulled up his pants, walked out and slammed the door. She waited five to ten minutes before leaving the room.

She also told the detective that defendant never punched her, but he had grabbed her in a way that left a bruise, and he wiped boogers on her. But "[h]e was worse about it to my sister."

## Verdict and Sentencing

The jury found defendant guilty of five counts of lewd or lascivious acts by means of force, violence, duress, menace, or threat (Pen. Code, § 288, subd (b)(1)), with a finding of substantial sexual conduct (Pen. Code, § 1203.066, subd (a)(8)). Two of the counts pertained to the first victim, three to the second. The jury also found the charged offenses were committed against more than one victim (Pen. Code, § 1203.066, subd (a)(8)). But on two of the counts of lewd and lascivious conduct on the first victim, the jury acquitted.

The trial court imposed an aggregate 30-year term consisting of five full-term consecutive middle terms.

## DISCUSSION

### I. Admission of Asserted Hearsay and Section 352 Objections

On appeal, defendant first contends the trial court abused its discretion in admitting certain hearsay evidence: (1) the recording of the detective's interview with the second victim; (2) the recording of the first victim's call to the grandfather; (3) the grandfather's trial testimony; and (4) the first victim's statements as presented through other witnesses. Defendant styles this contention as a hearsay objection, but the bulk of

12

the claim is that the evidence should have been excluded under Evidence Code Section 352[4] because the probability of undue prejudice substantially outweighed probative value.

We conclude these challenges are forfeited for failure to raise specific objections in the trial court.

### A. The Detective's Interview with the Second Victim

Defendant argues that only parts of the second victim's recorded interview with the detective were inconsistent with her testimony, and thus the remaining portions should have been excluded. We conclude this challenge is forfeited.

### 1. Additional Background

After the second victim testified disclaiming the molestation, and before the jury heard a recording of her interview with the detective, defense counsel objected on hearsay grounds: "I would like to object as hearsay on the grounds that . . . there are parts of it that [are] inconsistent, but in its entirety it should not be admitted, and I submit on that."

The trial court responded: "I assume there are going to be both prior inconsistent as well as consistent statements since she is denying in totality that any of the events happened. I assume that all of the interview . . . is going to be relevant to show her state of mind then, her demeanor, the fact that she had made inconsistent statements [prior] to trial, but that they were consistent with statements that she made during her disclosure."

The court continued: "*if there's something particular you wanted me to look at* that you thought was prejudicial or really out of bounds, I'd certainly consider that. But based on what I know and what I have seen in the trial, it seems to me that the entirety of the statement would be relevant, not only for consistency and inconsistency, but for

---

[4] Undesignated statutory references are to the Evidence Code.

13

demeanor and the nature of that disclosure to the detective.  So I would be prepared to allow it in its entirety without further *specific objection* at this point."  (Italics added.)

Defense counsel responded:  "Yes, your Honor, thank you."

Just before the recording was played, defense counsel renewed the objection:  "I would just restate our previous objection," but he offered no specific challenge to any portion of the interview.

### 2.  Analysis

On appeal, defendant identifies several portions of the recording that he contends are not inconsistent with the second victim's testimony and far more prejudicial than probative.[5]  But the failure to raise those challenges in the trial court forfeits them on appeal.

No verdict can be set aside based on the erroneous admission of evidence — including under section 352 — unless the record shows an objection "mak[ing] clear the specific ground."  (§ 353; *People v. Harrison* (2005) 35 Cal.4th 208, 230.)  And here, defense counsel offered only a blanket objection to the recording.

Defendant, however, maintains that "his objection was clearly enough to bring the issue to the trial court's attention."  We disagree.  The trial court indicated it would consider a specific objection "if there's something particular [counsel] wanted" the court to consider and then ruled it would allow the evidence in the absence of a "specific objection," and despite this, counsel did not identify any specific portion of the interview and state specific grounds for exclusion.

---

[5]  Defendant belatedly takes issue with (1) the detective's statements to the second victim that defendant "took all your power away," "needs to go to jail," and "knew what he was doing"; (2) the second victim's statement that she had heard defendant may have molested his cousin; and (3) the speculation that defendant was a danger to other children, including that it was "kinda scary" that he worked with kids.

While some portions of the recording may have been objectionable, the evidence of guilt rendered the erroneous admission of hearsay evidence harmless.  (See fn. 9, *post*.)

14

An objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Defense counsel's blanket, nonspecific objection did not do this, and that failure deprived the prosecution of the opportunity to respond. (*Id.* at p. 434 [objecting " 'allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal' "].) Moreover, "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id.* at p. 435; see also *People v. Holford* (2012) 203 Cal.App.4th 155, 169 (*Holford*) [applying section 353 to claims of error for failure to exclude evidence under section 352].) Thus, the challenge is forfeited.

## B. The Recording of the Phone Conversation with the Grandfather

Defendant next challenges the admission of a recorded phone conversation the first victim had with her grandfather. Defendant argues its admission was an abuse of discretion because the recording was hearsay and the danger of undue prejudice far outweighed any probative value.

We conclude that portions of the conversation were relevant and any claims concerning objectionable portions of the conversation are forfeited.

### 1. Additional Background

#### a. The In Limine Motion

The defense moved in limine to exclude the grandfather as a witness, explaining the grandfather had, in a phone call, tried to dissuade the first victim from testifying. Counsel argued: "this family has . . . a dozen people like [the grandfather] always talking to each other about what someone should do and what someone shouldn't do. There is no link between that conversation and [defendant], and if the Court were concerned whether there was a link, I would ask for a [section 402 hearing] on it." Counsel added

15

that it was unclear who called who.[6]

Counsel also objected that the statements in the recording were hearsay and irrelevant, but he did not specify any particular statements. He also noted that the grandfather had Fifth Amendment rights regarding possible attempted witness dissuasion. Counsel also argued that no statement from the grandfather established that defendant made any admissions to him.

The court asked if the recording might go to the victim's state of mind: "If she has a blood relative saying drop it, and she is still willing to come and testify, isn't there relevance there at least to her state of mind?" "[S]houldn't the prosecutor at least be able to ask . . . did anybody ever tell you to drop it? [J]ust like your sister." "It seems to me," the court continued, "that . . . the heart of the defense is going to be they are making this up, mom is pulling the strings, and one of the sisters . . . says I'm out. [I]sn't it relevant for the trier of fact to know that [the first victim's] receiving pressure from the outside to recant like her sister."

The trial court agreed defendant could be prejudiced if the jury believed he was behind the grandfather's pressuring, but such prejudice could be cured, the court explained, by telling the jury or stipulating that "there's no evidence that the defendant himself . . . had this in mind. This was strictly grandpa's idea."

The prosecutor also told the court the grandfather had said defendant regrets what he did. Defense counsel did not specifically object to those statements as unrelated to the credibility of the first victim or her state of mind. Nor did he register a section 352 objection. The trial court, however, suggested they would need to have an Evidence Code section 402 hearing regarding any purported admissions defendant made to the grandfather.

---

[6] The prosecutor confirmed the first victim called the grandfather.

The following week, defense counsel asked for clarification of the court's ruling concerning the recorded phone conversation. The court reiterated that the recording was relevant and admissible as to the first victim's state of mind, regarding the provision of testimony. Stating he was not sure if he "sufficiently articulated" his objection, defense counsel again argued the problem with the recording was that "it might create an implication that somehow [defendant] had been the initiation or the genesis of that dissuasion by [the grandfather]. There is no evidence in our discovery to show that that is true." Counsel complained he would not be able to call the grandfather to testify why he engaged in the dissuasion because the grandfather could assert his right against self-incrimination, and the defense had no authority to immunize him. "That's the only thing I forgot to mention is that the implication is that the dissuasion might have come from [defendant]."

The trial court noted that had been argued during the in limine hearing the previous week. The court added that it would instruct the jury, "that they are to take that call only to consider the effect of the state of mind of the witness and that there is no evidence and they should not consider that that in any way was at the prompting of the defendant."

In rearticulating his objection, counsel never mentioned the portions of the conversation where the grandfather implied defendant's guilt, such as grandfather's statements to the first victim indicating defendant regrets what he did; nor did counsel pose a section 352 objection. Consequently, the court was not called upon to make a ruling on that part of the recording.[7]

---

[7] The record does not disclose if the parties asked the trial court to listen to the recording of the phone conversation at any point prior to ruling on it; nor does it appear that the court did so.

### b. The Recording

Later, the first victim testified in front of the jury that her grandfather on her mother's side had told her father to get her to drop the charges. She subsequently had a phone conversation with that grandfather, which she recorded at the detective's behest.

In the recording, played for the jury, the grandfather repeatedly asked the first victim to drop the charges saying, among other things: "I think [defendant] has suffered every day," and, "[i]f [defendant] goes to prison he's going to be beaten and possibly killed, and he's going to be sodomized frequently." He told her that inmates in prison do not like child molesters and the guards provide no protection. He also told her he had written her parents a letter stating "in this situation there were no winners. There was only losers. [The first victim's] a loser. [The second victim's] a loser. And [defendant] is a loser also. There are no winners. There's only losers."

The grandfather also implied the allegations were true, stating: "I think [defendant] has regrets that'll never go away"; "there's things in our lives that we wish we could take back and we could change, but we can't"; "I think [defendant] made a terrible mistake"; "I know he threatened you and you being a child, you were afraid." "He did a bad thing but he's not a bad person"; and "my heart goes out to you and [the second victim]. I didn't know what was happening."

The first victim, in turn, maintained her desire for justice and to testify, stating: "He's my brother but I think he should be held to the same standard -- that other people do . . . ." and "He's my brother but . . . such evil has occurred that . . . I do feel like he needs to be held accountable for it."

She asked the grandfather, "Are you worried about what he could and might be doing to other kids too?," who replied: "No. It won't happen again." But when she said, "I would worry everyday about the possibility of something happening to some other child," the grandfather responded, "I think that's a fair statement."

18

At one point, the first victim said: "you didn't live in the house when [defendant] would beat up me and [my brother] just for fun and laugh at us when we had bruises . . . on our face and [my brother] would just sit there and take it . . . . And you didn't see when I as a six and seven-year-old would have to jump in between [them] and just, kind of, curl up in a ball in order to protect [my brother] and take [defendant's] punches. You didn't hear his laugh as he enjoyed what he was doing. And . . . you didn't see and experience the countless, countless times that he abused me and [the second victim] in such horrific ways that I think sometimes, especially as someone who is your blood, it can be easier to think of them as better . . . than they are."

During a break in the playing of the recording, defense counsel stated: "I was thinking at the end of the tape we should admonish the jury . . . . [The grandfather's] theories are not relevant. What is relevant is the impact that that had on [the first victim]. *Because otherwise it sounds like he has some special knowledge that [defendant] is guilty and that really was the basis of our objection.*" (Italics added.) The court agreed and thereafter instructed the jury: "During this phone call . . . [the grandfather] offers opinions regarding a variety of subjects. His opinions are not relevant and should not be considered as proof of any element of the charged offenses. The evidence is being offered for the sole purpose of its effect, if any, on [the first victim]." The trial court gave a similar admonition as part of the final instructions to the jury.[8]

---

[8] The trial court gave the following further admonition as part of the final instructions: "The opinions and theories of [the grandfather] cannot be considered for the truth of the matter. . . . [The grandfather's] opinions are relevant only to [the first victim's] state of mind. You cannot consider his opinions as evidence of anything else. You cannot consider them as admissions of the defendant, as they were not offered for that purpose, and there was no testimony from any witness that would allow you to infer that." We presume the jury followed these instructions. (*People v. Davis* (2005) 36 Cal.4th 510, 537.)

## 2. Analysis

Defendant argues the admission was an abuse of discretion because the recording was hearsay, and its undue prejudice far outweighed its probative value. He also argues the first victim's state of mind was not at issue, reasoning that the first victim's willingness to testify falsely despite pressure from family members was consistent with the defense's theory of the case. In his reply brief, defendant acknowledges cases hold that a witness' fear of recrimination can be relevant to assess the witness' credibility, but maintains this does not permit the admission of "*an entire recorded hearsay conversation replete with prejudicial comments simply because the conversation could be construed as creating such a fear.*"

We disagree that the victim's state of mind regarding testifying was not relevant. " 'A witness who testifies despite fear of recrimination of any kind *by anyone* is more credible because of his or her personal stake in the testimony.... [¶] Regardless of [the source of the threat], the jury would be entitled to evaluate the witness's testimony knowing it was given under such circumstances.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 86, quoting *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369, italics added.) Thus, "a trial court has discretion, within the strictures of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility even on direct examination, so long as the prosecution reasonably expects the defense to attack the witness's credibility during cross-examination." (*Merriman,* at p. 86.) The first victim's credibility was unquestionably at issue. Accordingly, here, it was proper for the prosecution to ask the first victim about family members, including the grandfather, that pressured her not to testify and to play those portions of the recorded conversation with her grandfather related to that pressure.

The People maintain that any challenge as to undue prejudice is forfeited for failure to object on that basis. We agree. After much of the recording was played for the jury, counsel belatedly articulated as grounds for the objection that the grandfather's

20

statements sounded like "he has some special knowledge that [defendant] is guilty and that really was the basis of our objection." Despite the claim "that really was the basis of our objection," counsel never made this specific objection before, and when he mentioned it on this occasion after part of the recording had been played, he did not cite section 352; nor did counsel ever suggest an evidentiary alternative under section 352, such as redaction of the specific statements that implied defendant's guilt. Failure to do so forfeits the claim on appeal. (*Holford*, *supra*, 203 Cal.App.4th at pp. 169-170 [noting that a timely and specific objection is required to preserve a section 352 claim on appeal and holding that "when making a section 352 objection grounded upon the existence of an evidentiary alternative [e.g., redaction], the requirement in section 353, subdivision (a), to state specific reasons for an objection necessarily requires the objecting party to identify the evidentiary alternative with specificity"].)[9]

---

[9] We also note that, although the grandfather's statements implying defendant's guilt were objectionable, defendant was not prejudiced by their admission. Nine witnesses testified to a consistent timeline related to the allegations: the victims were molested at a young age; they separately disclosed five years apart, both while in high school, and both while suffering from depression; they both disclosed to multiple individuals who testified to hearing those disclosures; while the second victim maintained she had been lying, her testimony corroborated the timeline, and did not in any way suggest the first victim was lying; given the family pressure brought to bear upon the first victim, a reasonable jury could have inferred that the second victim's recantation was the result of similar pressure; despite the family pressure, the parents both testified that defendant admitted molesting the first victim; and the teacher's testimony lent credence, recalling that defendant had said to him, "you don't understand what I've done or how bad I am." There was no reasonable probability that defendant would have obtained a more favorable result had the objectionable portions of the recorded statement been redacted. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674]; see also (*Harrington v. Richter* (2011) 562 U.S. 86, 104 [178 L.Ed.2d 624] ["It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding' " and "the likelihood of a different result must be substantial, not just conceivable"].)

21

## C. The Grandfather's Testimony

Defendant also argues the court compounded the error of admitting the first victim's phone conversation with the grandfather by permitting the prosecution to call the grandfather to testify and question him about his statements on the recording. We conclude the contention is forfeited.

### 1. Additional Background

Later in the trial, after the recording of the phone conversation was played for the jury, the prosecution called the grandfather to testify. The prosecutor's questions elicited that the grandfather had had 15 visits with defendant between 2015 and trial. Also the grandfather had helped defendant through the proceedings, financially and with advice.

The prosecutor asked the grandfather whether he considered himself a "Christian man," whether he had imparted the ideas of "Christian forgiveness" on his children, and whether he believes in the criminal justice system. She also asked if forgiveness outweighs being held accountable in a court of law. The prosecutor also questioned the grandfather at length about his letter and the phone conversation: "did you want to hold the family together so much that you attempted to get [the first victim] to drop the charges?"

During a break, defense counsel asked the court to "shut down" the testimony and admonish the jury to disregard it. He cited the closeness between the grandfather and defendant, "so it's really [section] 1101 on [defendant], unless [the grandfather] were to say [defendant] asked me and urged me to try to dissuade, which he hasn't done. And I have made this argument before, Judge."

The court explained "I'm confident about my prior ruling," noting the grandfather's efforts "to attempt to, at least in the prosecutor's view, to dissuade the witness [the first victim] from testifying" is relevant to the victim's state of mind. But the court noted it would be inappropriate for defendant's character to be impinged by the grandfather's, thus a cautionary instruction had been given and, the court added, "I would

22

be happy to give another one . . . ." As noted, the trial court gave an instruction further admonishing the jury as to the limited purpose of the testimony as part of its final instructions. (See fn. 8, *ante*.)

On cross-examination, the grandfather testified the writing and "meddling" he did was not encouraged or requested by defendant. The grandfather said he did it, "[t]rying to hold our family together."

### 2. Analysis

On appeal, defendant challenges specific portions of the elicited testimony: (1) the prosecutor asking if the grandfather considered himself a Christian in order to contrast his beliefs with his conduct; (2) questioning his concept of forgiveness and how it conforms to the law; (3) questioning his support for defendant, "deftly associating [defendant] with [his grandfather's] conduct"; (4) probing the grandfather's out-of-court statements from the recording and in a letter to the father; and (5) offering questions that were "thinly disguised denunciations." He argues that the grandfather had no relevant evidence to offer, his attempt to dissuade the victim was already in evidence, and his testimony could only serve to unfairly prejudice defendant.

Like the recorded phone conversation between the grandfather and the first victim, portions of the grandfather's testimony had some relevance to the victim's credibility. And like the phone conversation, some of the testimony was properly subject to a section 352 objection. But again, no objection was made to specific portions of the testimony and no section 352 object was raised, which forfeits the challenge on appeal.[10]

---

[10] We again note that given the overwhelming evidence supporting the guilty verdicts, defendant was not prejudiced by the failure to object to specific portions of the testimony or make a specific section 352 objection. (See fn. 9, *ante*.)

### D.  The First Victim's Other Hearsay Statements

Defendant next challenges the admission the first victim's out-of-court statements as presented through various witnesses.  He argues they were inadmissible for the first victim's state of mind because her state of mind was not relevant, nor were they admissible as consistent statements under section 791, because it was the defense's theory that the first victim had a motive to lie from the start of her accusations.[11]  He also argues the repeated invocations of the first victims' disclosures were substantially more probative than prejudicial.

The People again respond that the contention is forfeited for failure to object to the challenged testimony in the trial court.[12]  And we again agree with the People.  The failure to object to inadmissible hearsay evidence at trial forfeits the claims on appeal. (*People v. Eubanks* (2011) 53 Cal.4th 110, 142; § 353.)

### II.  Evidence of a Prior False Allegation

Defendant next contends the trial court abused its discretion "by dictating which witness" defendant must call to admit impeachment evidence.  The record does not demonstrate that the trial court abused its discretion in precluding the defense from presenting evidence of a prior false allegation through the testimony of the proffered witness.

---

[11] Section 791 subdivision (b) permits the introduction of consistent statements where: "An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, *and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen*."  (Italics added)

[12] Although the Attorney General asserts forfeiture, defendant does not address this forfeiture assertion in his reply brief.

## A. Additional Background

The defense moved in limine to admit evidence of an alleged prior false accusation of rape and sexual misconduct by the first victim. The evidence, as proffered, was that between October 2016 and October 2017, the first victim had a relationship with a married pastor. Toward the end, the first victim told the pastor's wife she loved the pastor and texted her a picture of his genitalia. For several weeks, she implored the pastor to leave his wife, implying she was a danger to herself if he did not (the pastor's home was also vandalized). When the pastor declined, she sued him, claiming he raped her, coerced her into sex, and hit her.[13] Both sides sought temporary restraining orders.

The defense sought to impeach the first victim by showing she had accused the pastor of rape and assault after he refused to leave his wife. At the hearing, the trial court, citing *People v. Winbush* (2017) 2 Cal.5th 402, 469 (*Winbush*), noted the prior accusation of rape must be "shown to be false." The court questioned if the defense could make that showing through, as proposed, the testimony of pastor's wife: "The only way that a true false allegation can be proved is if the [the pastor] would be willing to come into this courtroom and sit in that chair and say we had a consensual relationship, I never forced her to do anything."

Defense counsel countered that the first victim "came to [the pastor's wife's] front door and told her they had a consensual sexual relationship. So we will prove it out of [the first victim's] own words to [the wife]."

The court responded that the first victim could have believed at that time the relationship was consensual but later understood it was the product of coercion: "because she is filtering that through, wait a second, he is a pastor. He's 40 years older than me."

---

[13] The first victim's civil complaint alleged the pastor "used emotional, verbal, and physical force to coerce [her] into having sex with him on hundreds of occasions under the guise that he was helping to heal her PTSD and trauma from childhood sexual abuse."

The court went on, "here is the crux of it, the fact that the wife would say she told me it was consensual, that does not in my mind get to the issue of whether or not it is a false report of coerced sex." The court noted, the wife "wasn't there" and couldn't testify to how they interacted with each other, "[t]he only person who can speak to that is the husband . . . . If you had that, that seems to me to be the type of evidence, the quality of evidence that is required under [*People v. Tidwell* (2008) 163 Cal.App.4th 1447 (*Tidwell*)] and *Winbush*."

Later, after the prosecution closed its case in chief, defense counsel informed the court that it had opted not to call the Pastor: "after meeting with [the pastor], I've come to the inescapable conclusion that his credibility would be very difficult for this jury. [¶] I think it would probably cast [the first victim] . . . in a very sympathetic light. . . . [The pastor] would not be helpful for the defense."

## B. Analysis

Defendant argues that the trial court abused its discretion in conditioning the admission of the false accusation evidence on the pastor testifying. He argues that whether the pastor's wife's testimony sufficed to prove the accusations were false went to the weight of the evidence, not admissibility. We conclude defendant has not shown that the trial court abused its discretion.

"A prior accusation of rape is relevant to the complaining witness's credibility, but only if the accusation is *shown to be false*." (*Winbush, supra,* 2 Cal.5th at p. 469, citing *Tidwell, supra,* 163 Cal.App.4th at p. 1457, italics added.) As this court explained in *Tidwell*, whether to admit such evidence is considered under the rubric of section 352. (*Tidwell* at pp. 1456-1458.) As such, a false allegation's probative value turns on the proof that the prior allegation was in fact false. (*Id.* at p. 1458.) Further, establishing the falsity of an allegation related to a past incident that never reached the point of formal charges may consume considerable time and divert jurors' attention from the case at hand — another relevant section 352 consideration. (*Tidwell* at p. 1458.)

26

We review a trial court's decision to exclude evidence of a prior accusation of rape under 352 for abuse of discretion. (*Winbush, supra,* 2 Cal.5th at p. 469; *Tidwell, supra,* 163 Cal.App.4th at p. 1457.) An exercise of discretion in precluding such evidence will be affirmed unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice. (*Winbush*, at p. 469.)

Here, we cannot say the trial court abused its discretion in excluding the testimony of the pastor's wife to prove a prior false allegation. As the trial court explained, the wife knew little of the actual relationship between the pastor and the first victim. Though the wife could repeat the victim's statements professing love for the pastor and the characterization that the relationship was consensual, such testimony would have relatively low probative value as to whether the relationship was actually coerced. The pastor's testimony, by contrast, would go to the heart of that question. (See *Tidwell, supra,* 163 Cal.App.4th at p. 1458 [Noting that "[a]lthough there was some evidence [the victim] made inconsistent statements, there was *no conclusive evidence that her prior rape complaints were false*" as "the defense was unable to obtain evidence from the men that [the victim] accused, and inferences could be drawn either way from the circumstances of the prior incidents and [the victim's] statements concerning the incident" (Italics added)].)

Defendant has failed to prove the trial court's exercise of discretion in precluding the wife's testimony was arbitrary, capricious, or patently absurd and resulted in a miscarriage of justice. Accordingly, we find no abuse of discretion.

### III. Child Sexual Abuse Accommodation Syndrome

Next, defendant challenges the admission of testimony regarding Child Sexual Abuse Accommodation Syndrome. We conclude this challenge is also forfeited.

### A. Additional Background

The prosecution moved in limine to admit expert testimony "to dispel misconceptions about child molestation," averring that several myths would likely be

alluded to, including: (1) the victims' failure to immediately disclose the abuse; (2) the victims not appearing frightened, upset, or traumatized; (3) the victims continuing to socialize with defendant; (4) the victims not knowing specific dates and times of the molestations; and (5) the victims' failure to protect themselves from being molested.

At the hearing, the trial court announced to the parties: "That brings us to the Child Abuse Accommodation Syndrome." The court asked defense counsel, "did you want to object to or make any comment regarding [the expert's testimony]?" Counsel answered: "We would object and submit."

The court responded, "[s]o this is pretty common now," and citing *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744, which explained that Child Sexual Abuse Accommodation Syndrome "testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to molestation." And according to the trial court, testimony explaining why a victim would not immediately report was "an appropriate area for discussion." The court then admitted the expert testimony "for the limited purposes that the People have offered," noting it "is relevant, [and] will be helpful to the jury."

Defense counsel offered no further objection and did not object when the prosecution's expert testified to Child Sexual Abuse Accommodation Syndrome.

### B. Analysis

On appeal, defendant argues admitting the testimony was an abuse of discretion. While noting such testimony is permissible in certain circumstances, he maintains those circumstances were not present here. He argues the defense did not attack the victims' claims based on their delayed reporting. Rather, the defense's theory was that the victims' claims were the result of the mother's influence. He also argues that neither party articulated a basis to assume the jury would adhere to any myth based on the facts of the case.

28

The people maintain the claim is forfeited.  We agree.  (See *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].)  No argument now advanced on appeal was raised before the trial court.  Counsel's blanket objection was insufficient to preserve them.[14] The contention is therefore forfeited.

## IV.  Cumulative Error

Defendant finally claims the above errors were cumulatively prejudicial.  As we have rejected every contention raised, we decline to find cumulative prejudice.  We therefore find no cumulative error.

---

[14] Defendant maintains that he sufficiently objected because the prosecution "laid out the relevant issues — including the potential prejudice of the evidence — in their motion in limine," and by objecting, he put the trial court on notice that he disputed the prosecution's arguments.  Also, the trial court, "conducted an analysis of its own accord based on the objection."  We disagree.  The arguments raised on appeal were never raised below. Thus, neither the prosecution nor the trial court had the opportunity to specifically address them.  And that the trial court "conducted an analysis" that peripherally relates to an argument raised on appeal does not obviate trial counsel's obligation to make a specific objection.

## DISPOSITION

The judgment is affirmed.

/s/

MURRAY, J.

We concur:

/s/

RAYE, P. J.

/s/

RENNER, J.